## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **INGRAM BARGE COMPANY, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-01023** |
| | ) | **Judge Aleta A. Trauger** |
| **LOUIS DREYFUS COMPANY, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Louis Dreyfus Company, LLC ("LDC") has filed a Motion to Dismiss or, in the Alternative, to Transfer Venue (Docket No. 18), to which Ingram Barge Company, LLC ("Ingram") has filed a Response (Docket No. 24), LDC has filed a Reply (Docket No. 25), and Ingram has filed a Sur-Reply (Docket No. 28). For the reasons set out herein, LDC's motion will be granted.

## I. BACKGROUND

LDC is a Connecticut-based commodities trading company incorporated in Delaware. It controls a significant share of the U.S. grain market. (Docket No. 20 ¶¶ 2–4; Docket No. 24-1 ¶ 3.) LDC subsidiaries—namely, Louis Dreyfus Company Cotton Storage, LLC and Louis Dreyfus Company Cotton LLC—own physical properties in Tennessee, but those subsidiaries and properties are unrelated to the grain-trading at issue in this case.[1] (Docket No. 20 ¶ 5.) LDC does, however, have a Tennessee grain dealer license, "to conduct business in Tennessee if it desires." (*Id.* ¶ 7.)

---

[1] This case involves soybeans and dried distillers grains. For ease of reading, the court will refer to these commodities merely as "grains."

Around May 21, 2019 and July 15, 2019, traders working for LDC entered into agreements to purchase grain from COFCO International Grains US, LLC ("COFCO") and Green Plains Trade Group, LLC ("Green Plains"). LDC characterizes the grains as purchased on a "CIF" basis—that is, "cost, insurance, freight," also known as "delivered"—meaning that seller was responsible for paying the charges for transporting the grain from its point of origin to the buyer's point of receipt.[2] In this instance, the grains were to be received in Louisiana. (*Id.* ¶¶ 10–12.)

Among the carriers that LDC frequently uses to transport its grains is Ingram, a Tennessee-based river freight company. (Docket No. 24-1 ¶ 3.) COFCO and Green Plains engaged Ingram to ship the grains at issue to Louisiana. Ingram used a version of its standard bill of lading for the jobs. "A bill of lading is 'the basic transportation contract between the shipper-consignor and the carrier.'" *Great W. Cas. Co. v. Flandrich*, 605 F. Supp. 2d 955, 964 (S.D. Ohio 2009) (quoting *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1982)). "A bill of lading has three purposes: (1) it records that a carrier has received goods from the party that wishes to ship them; (2) it defines the terms governing the carriage; and (3) it serves as evidence of the contract for carriage." *CSX Transp., Inc. v. Meserole St. Recycling*, 618 F. Supp. 2d 753, 765 (W.D. Mich. 2009) (citing *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18–19 (2004)).

In its most simplified form, a bill of lading defines the relationship of three parties—the consignor, the consignee, and the carrier—although it is possible for one entity to serve in more than one of those capacities. The consignor is the shipper—the party arranging for the goods to be shipped. *See Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949, 954 (9th Cir. 2008). The consignee is "[t]he person named in the bill of lading as the person 'to whom or to whose order the bill promises delivery." *Paper Magic Grp., Inc. v. J.B. Hunt Transp., Inc.*, 318

---

[2] In contrast, commodities can also be purchased on an "origin" basis, meaning that the buyer must arrange to transport the commodity to the desired location.

F.3d 458, 461 (3d Cir. 2003) (quoting U.C.C. § 7-102 (2002)). The carrier is the party that carries

the goods from where they can be found to where they are received. *See* Saul Sorkin, 1 Goods in

Transit § 1.02 (2019) ("Carriers of goods, in addition to their description by mode, such as motor

carriers, rail carriers, carriers by water, sea or air are also designated by other terms such as

common carrier, private carrier, contract carrier, non-vessel operating common carrier, freight

forwarder, consolidator, or dispatcher.").

Ingram has provided four bills of lading related to the grain shipments at issue in this case.

(Docket Nos. 1-3, 1-7, 1-11, 1-19.) Each bill of lading designates the relevant grain seller as the

consignor. For example, Bill of Lading No. ING19-00481 identifies the consignor as "COFCO

INTERNATIONAL GRAINS US, LLC." That bill of lading has a "CONSIGNED TO:" field that

states, "ORDER OF COFCO INTERNATIONAL GRAINS US, LLC." Below the "CONSIGNED

TO:" line is a line designating the shipment's destination, and below that is a line that reads as

follows: "NOTIFY: LOUIS DREYFUS CORP@PORT ALLEN A/C COFCO." (Docket No. 1-3

at 2.) "A/C," Ingram has explained, means "on account of." (Docket No. 24-1 ¶ 4.) The bill next

identifies the relevant barge, after which it reads "FREIGHT: Prepaid." It includes signature blocks

for Ingram and COFCO, although only Ingram's includes an actual signature.[3] (Docket No. 1-3 at

2.) The other bills of lading are essentially the same in the relevant respects: the grain seller is the

consignor; the consignment is to the order of the seller; LDC is included as a "notify" party "A/C"

the seller; the freight is described as prepaid; and the signature blocks are for Ingram and the seller.

(Docket Nos. 1-7 at 2, 1-11 at 2, 1-19 at 2.)

Ingram has provided a Declaration by its Director of Agriculture and Dry Bulk Sales, Matt

Tomayko, in which Tomayko discusses the bills of lading. Tomayko explains that "[i]t is not

---

[3] Neither party to this case disputes that COFCO assented to the bill of lading.

normal for bills of lading to be signed by the cargo owner," because "[s]ignatures are neither

customary nor feasible when a particular bill of lading may be negotiated multiple times as the

related cargo sails down river or over the sea." (*Id.* ¶ 8.) Tomayko also offers the following

explanation of the significance of the "notify" field and his company's use of "A/C":

> Ingram's standard bill of lading contains several fields, including: (1)
> "Transportation Ordered By," which identifies the Seller; (2) "Consigned To,"
> which identifies the Seller's first consignee of the cargo; and, (3) "Notify," which
> identifies the ultimate consignee and receiver of the cargo. At times, the "Notify"
> field identifies multiple companies. In such cases, the first name listed is the
> ultimate consignee, receiver, and owner of the cargo. The other names listed,
> typically after "A/C," meaning "on account of," are companies in the consignment
> chain, but who are not the ultimate consignee, receiver, and owner of the cargo.

(Docket No. 24-1 ¶ 4.) Accordingly, pursuant to Tomayko's characterization of the terms, "[a]ll

of the bills of lading contained in Ingram's complaint were ultimately consigned to LDC," despite

any appearance to the contrary. (*Id.*)

> Each bill of lading relevant to this case included the following language:
>
> It is mutually agreed, as to each carrier of this property over all or any portion of
> said route, and to each party at any time interested in all or any part, of said property,
> that every service to be performed hereunder is (or will be deemed) subject to
> Carrier's Grain Transportation Terms which are posted on Carrier's webpage at
> www.ingrambarge.com/graintransportationterms.pdf . . . ; any Consignee hereto is
> (and will be deemed) bound by Carrier's Grain Transportation Terms.

(Docket Nos. 1-3 at 2, 1-7 at 2, 1-11 at 2, 1-19 at 2.) The Grain Transportation Terms are a separate

document available from Ingram or Ingram's website. They consist of 36 detailed items covering

issues related to the carriage of grain and the relationships of the related parties, including the

following paragraph:

> **28. Choice of Law and Forum:** This Contract is governed by the General Maritime
> Law of the United States and to the extent not inconsistent therewith, the laws of
> the State of Tennessee, both as to interpretation and performance. Any dispute
> arising from this Contract, the applicable bill of lading, or the performance of
> Carrier or Shipper's obligations under either this Contract or the applicable bill of
> lading must be brought in the U.S. District Court for the Middle District of

4

Tennessee. Each party hereby irrevocably waives any objection to personal jurisdiction or venue therein. Each party also waives its right to a trial by jury.

(Docket No. 1-2 at 4.) The Grain Transportation Terms purport to bind "[a]ny entity that places an order for transportation of heavy grains, soybeans in bulk, (or any combination thereof) with" Ingram, as well as "any entity that causes the loading of such a cargo into [Ingram's] barges or that holds the bill of lading covering cargo transported in [Ingram's] barges." (*Id.* at 2.) The Terms state that the grain seller and grain purchaser are jointly and severally obligated to fulfill all of the contractual obligations of the "Shipper," which the Terms define to include both "the entity ordering the cargo transportation and the owners of the cargo (including any consignee(s))." (*Id.*)

On April 22, 2019, prior to the shipments, Tomayko sent an email to LDC trader Eric LaRosee stating as follows:

Good Afternoon,

I tried calling you this afternoon to discuss and wanted to give you a heads up on this. We are combining the terms on our grain transportation terms and [bill of lading] into one document. Attached is a new copy of our grain transportation terms. They can also be found on our website at : [URL].

Please let us know if you have any questions or concerns.

Thanks

(Docket No. 24-1 at 4 (ex.1).) Ingram characterizes this email as notifying LDC of the Grain Transportation Terms.

The grains covered by the bills of lading were ultimately received by LDC, which also received the bills of lading in connection with the shipments. Over the course of the shipping, however, Ingram allegedly incurred costs that, it argues, LDC is ultimately liable to pay, as one of the parties defined by the Grain Transportation Terms as the "Shipper." LDC paid Ingram demurrage charges—penalties related to delayed loading or unloading of goods, *see CSX Transp.*

5

*Co. v. Novolog Bucks Cty.*, 502 F.3d 247, 250 (3d Cir. 2007)—for at least some of the grains, but LDC maintained it was not liable for the unrelated expenses that Ingram incurred *en route*. (Docket No. 1-27.) On November 18, 2019, Ingram filed its Complaint against LDC. (Docket No. 1.) In the Complaint, Ingram alleges that LDC "did not pay the third-party marine service providers for shifting, fleeting, and wharfage services provided to the barges carrying its cargo after they were placed or constructively placed by Ingram pursuant to the Grain Transportation Terms." (*Id.* ¶ 16.) According to Ingram, LDC became liable for those charges because, in each instance, it "became the consignee prior to discharge of the cargo from the barge." (*Id.* ¶ 18, 25, 32, 29.)

On January 13, 2020, LDC filed a Motion to Dismiss or, in the Alternative, to Transfer Venue to the Middle District of Louisiana. (Docket No. 18.) LDC argues that this court lacks jurisdiction over it, that venue is improper, and that Ingram has failed to state a claim on which relief can be granted. (*Id.* at 1.)

## II. LEGAL STANDARD

In considering a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a court has three options. It may (1) rule on the motion on the basis of the affidavits and materials submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion.[4] *See Dean v. Motel 6 Operating L.P*., 134 F.3d 1269, 1272 (6th Cir. 1998). It is in the court's discretion, based on the circumstances of the case, which path to choose. *Id.* In any proceeding, however, the party asserting jurisdiction has the burden of proof. *See Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). "Additionally, in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit

---

[4] Neither party has requested an evidentiary hearing in this case.

or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

When a court rules on a motion to dismiss for lack of personal jurisdiction based upon the affidavits or other preliminary materials, the party asserting jurisdiction need only make a *prima facie* showing of jurisdiction to defeat the motion. *Theunissen*, 935 F.2d at 1458. In examining whether the party asserting jurisdiction has made this *prima facie* showing, the court is to construe the facts presented in the light most favorable to that party. *Bird*, 289 F.3d at 871; *see also Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360-61 (6th Cir. 2008) (referring to the plaintiff's burden in this context as "relatively slight").

## III. ANALYSIS

In order for this court to exercise personal jurisdiction over a non-resident defendant, such as LDC, the defendant must have "certain minimum contacts with the [forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct grounds for personal jurisdiction. *Id.* at 417-18. General jurisdiction allows the court to "exercise jurisdiction over any claims a plaintiff may bring against the defendant," whereas specific jurisdiction "grants jurisdiction only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state." *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678–79 (6th Cir. 2012) (citing *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997)).

"The 'paradigm' forums in which a corporate defendant" will be subject to general jurisdiction "are the corporation's place of incorporation and its principal place of business," with

general jurisdiction available elsewhere only in "exceptional" cases. *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1552 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 136 (2014)). It is undisputed that LDC is neither incorporated in nor headquartered in Tennessee, and Ingram does not allege that LDC is subject to the court's general personal jurisdiction.

The assertion of specific jurisdiction "depends on an affiliation between the forum and the underlying controversy," such as an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Walden v. Fiore*, 571 U.S. 277, 284 n.6 (2014) (internal quotation and citation omitted). Ingram has not demonstrated any connection between this district and Ingram's dealings with LDC other than the forum selection clause in Ingram's Grain Transportation Terms. Whether the court has personal jurisdiction over LDC will, therefore, come down to whether that clause provides an adequate basis for exercising jurisdiction.

The Sixth Circuit has recognized that parties may, through a forum selection clause, "agree in advance to submit to the jurisdiction of a particular court." *Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006) (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)). That rule arises from the premise that the right not to be subject to a particular court's personal jurisdiction is a "waivable right," and a party may, therefore, "consent to the personal jurisdiction of a particular court system" that otherwise would not have jurisdiction. *Id.* (quoting *Kennecorp Mortg. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.* 610 N.E.2d 987, 988 (1993)). LDC does not dispute the legal principle that a party could voluntarily submit to this court's jurisdiction. LDC argues, however, that it has not consented to the jurisdiction of this court because the agreements at issue were solely between the grain sellers and Ingram.

"Although a bill of lading is a contract between a shipper and a carrier, it can nonetheless bind a non-party buyer where there is consent to be bound*." Kawasaki Kisen Kaisha, Ltd. v. Plano*

8

*Molding Co.*, 696 F.3d 647, 655 (7th Cir. 2012) (citation omitted). Most commonly, courts have held that "[a] non-party buyer may accept the terms of the bill of lading where it files a lawsuit under the bill, and attempts to benefit from its terms." *Id.* (citing *Steel Warehouse Co. v. Abalone Shipping Ltd.*, 141 F.3d 234, 237 (5th Cir.1998)); *see also Flying Phoenix Corp. v. Creative Packaging Mach., Inc.*, 681 F.3d 1198, 1201 (10th Cir. 2012); *Kukje Hwajae Ins. Co. v. M/V Hyundai Liberty*, 408 F.3d 1250, 1254 (9th Cir. 2005); *APL Co. Pte. v. Kemira Water Sols., Inc.*, 890 F. Supp. 2d 360, 366 (S.D.N.Y. 2012); *Taisheng Int'l Ltd. v. Eagle Mar. Servs., Inc.*, No. Civ. A. H–05–1920, 2006 WL 846380, at *3 (S.D. Tex. Mar. 30, 2006); *Anchor Seafood, Inc. v. CMA-CGB (Caribbean), Inc.*, No. 05-23097-CIV, 2005 WL 4674292, at *2 (S.D. Fla. May 4, 2005). LDC, of course, did not bring this suit and has not sought to legally enforce any provisions of the bills of lading or the Grain Transportation Terms. Ingram argues that LDC nevertheless agreed to be bound by the bills of lading when it supposedly became what Ingram refers to as the "ultimate consignee" of the grain.

As LDC points out, however, the bills of lading clearly establish that the grain sellers were both the consignors and consignees under the bills, with LDC designated only as a "notify" party. Although Ingram attempts to rely on the Tomayko Declaration to give the "notify" designation some meaning other than its facially apparent one, the concept of a "notify" party as distinct from the consignee is well-established. The Supreme Court considered the issue well over a century ago, in *North Pennsylvania Railroad Co. v. Commercial National Bank of Chicago*, 123 U.S. 727 (1887), in which it considered a claim based on the improper delivery of cattle to the party designated "Notify" rather than the party designated "Consigned to" in the relevant bill. *Id.* at 729. As the Court observed, status as a "notify" party is inherently distinct from being the consignee; otherwise, "the direction to notify [that party] would be entirely unnecessary, because the duty of

9

the carrier is to notify the consignee on the arrival of goods at their place of destination" regardless. *Id.* at 736. Although Ingram attempts to give the impression that its standard bill of lading is some specialized form that requires a Declaration for the court to understand the full depths of its meaning, its party designations are essentially the same as those that were used by the *North Pennsylvania Railroad* parties. It is clear that, based on long-established and widely understood freight terminology, the grain sellers, not LDC, were the consignees under the bills of lading. Ingram has provided no authority for the premise that LDC somehow became the "ultimate consignee" simply because it purchased and accepted the grain.

The designation of the grain sellers as consignees is consistent with LDC's characterization of its expectations under the purchase contracts. According to LDC, it paid the price necessary to purchase the grain on a CIF basis, putting the responsibility for paying for transport on the sellers. It makes sense, then, that the sellers would be the consignees. "[C]onsignee status is more than a mere designation. The term takes on a legal significance due to the quasi-contractual relationship that arises between the consignee and the carrier." *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1281 (11th Cir. 2009). Designating the grain sellers as both consignors and consignees ensured that they took full responsibility for the carrier relationship, which, according to LDC, is what it paid for.

The only basis the court could have for holding LDC to the forum selection clause, therefore, would be if the court concluded that LDC consented to the clause merely by being the purchaser of, and ultimately accepting, the grain. "[A] present or future ownership interest in the goods" alone, however, is not "sufficient . . . to constitute acceptance of [a] Bill of Lading." *APL Co. PTE. v. UK Aerosols LTD.*, No. C 05-0646-MHP, 2006 WL 3848784, at *3 (N.D. Cal. Sept. 28, 2006). The fact that LDC was the company that had actually purchased the grain, therefore, is

not sufficient to bind it to the bills. Similarly, Ingram has not identified any authority establishing that LDC became bound merely because it was designated as the "notify" party or because it took eventual possession of the grain. To the contrary, all of the relevant authority appears to suggest that, if anyone other than the consignor and carrier would be bound by a forum selection clause such as this, it would be the consignee—who, in this instance, happened already to be bound as the consignor regardless.

Even assuming that the bills of lading, combined with the Grain Transportation Terms, demonstrate a desire to draw the circle of bound parties more broadly than the traditional definition of "consignee" would allow—for example, by reaching any "party at any time interested in all or any part" of the transported goods or by defining "Shipper" to include numerous parties other than the actual shipper—then that attempt would run afoul of the principle that "[a] party cannot unilaterally employ definitions to bind another by provisions to which the other has not consented to be bound." *United States v. Waterman S.S. Corp.*, 471 F.2d 186, 189 n.4 (5th Cir. 1973) (discussing broad definition of "shipper" in bill of lading); *see also In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 72 (S.D.N.Y.) (discussing meaning of the term "shipper"). LDC did not negotiate the bills of lading, agree to the bills of lading, take on responsibilities under the bills of lading, or accept the designation of "consignee" under the bills of lading; all it did was accept the grains and receive their bills of lading, which were marked "prepaid" and which, on their faces, did not hold LDC to the role of consignee.

Finally, Ingram argues that LDC's payment of demurrage charges related to its grain shipments is evidence that LDC accepted the requirements of the bills of lading and Grain Transportation Terms. (*See* Docket No. 1-27 (demurrage invoice).) Paragraph 16 of the Grain Transportation Terms requires the "Shipper"—defined broadly to include both the consignor and

11

any "owners of the cargo"—to pay demurrage charges based on days that the barge sits unused awaiting either loading or unloading. (Docket No. 1-2 at 2, 6.) Specifically, "for the first ten days of demurrage, Shipper shall owe Carrier $300 per barge per day, and for any additional days after the first ten days, Shipper shall owe Carrier $400 per barge per day." (*Id.* at 6.) It does appear that LDC paid some charges incurred pursuant to those terms. LDC's payment of demurrage charges, however, would not necessarily have been premised on its acceptance of the terms of the bills of lading. LDC had independent relationships with and duties to the grain sellers. LDC's payment of the demurrage charges for which the sellers would otherwise be liable can easily be explained in terms of LDC's obligations to the sellers, not Ingram—particularly given that the accrual of demurrage charges may have been LDC's fault. Merely pointing to the demurrage payments' existence, therefore, is not sufficient to overcome Ingram's burden to establish jurisdiction, and the court lacks sufficient context or detail to draw any inference establishing jurisdiction from the payments.

Ingram, therefore, has not carried its burden of establishing that LDC consented to, or is otherwise subject to, the jurisdiction of this court. LDC has requested that the claims against it be dismissed, but it also raised the possibility of transfer to a district court in Louisiana. Confusingly, LDC's Motion itself states—more than once—that the requested transfer would be to the Middle District of Louisiana. (Docket No. 18 at 1.) Its Memorandum, however, includes language requesting a transfer to the Eastern District of Louisiana, and both districts have some connection to this case, in terms of either where the cargo was delivered or where the underlying charges were accrued. (Docket No. 19 at 17.)

Sixth Circuit and Supreme Court caselaw make clear that a district court can, in its discretion, transfer, rather than dismiss, a case where it otherwise lacks personal jurisdiction. *See*

12

*Stanifer v. Brannan*, 564 F.3d 455, 458–61 (6th Cir. 2009) (discussing *Goldlawr v. Heiman*, 369 U.S. 463 (1962)). Such a decision, however, is easier when there is no doubt about what "the proper district" for the suit is. *Id.* at 458. Here, however, there appear to be multiple districts that would have personal jurisdiction over the claims, and the record does not definitively establish that venue would only be appropriate in one particular district. In light of the deference owed to the "plaintiff's choice of forum*," Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981), the court will dismiss the claims without prejudice to permit Ingram to refile in the district of its choice.

## IV. CONCLUSION

For the foregoing reasons, LDC's Motion to Dismiss or, in the Alternative, to Transfer Venue (Docket No. 18) is hereby **GRANTED**. Ingram's claims are **DISMISSED** without prejudice for lack of personal jurisdiction.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge

13